We'll hear argument this morning in Case 22-148, Jack Daniel's Properties v. VIP Products. Ms. Flatt? Mr. Chief Justice, and may it please the Court, this case involves a dog toy that copies Jack Daniel's trademark and trade dress and associates its whiskey with dog poop. After a four-day trial, the District Court found both infringement and dilution. The Ninth Circuit erroneously reversed both holdings. As to infringement, the Ninth Circuit did not disturb the trial court's finding of likelihood of confusion. It instead reversed by applying an exception to the Lanham Act that the Second Circuit in Rogers v. Grimaldi invented for movie titles. Under Rogers, an expressive work is allowed to confuse as long as the use of a mark is artistically relevant and not explicitly misleading. But the Lanham Act has no exceptions for expressive works. It bars using marks for any goods when likely to cause confusion as to origin, sponsorship, or approval. Artistic relevance has nothing to do with confusion, and both implicit and explicit uses can confuse. Nor does constitutional avoidance justify Rogers. Rogers doesn't plausibly construe any text, and there are no First Amendment issues to avoid. Trademarks are ancient property rights that necessarily restrict speech to protect investment and goodwill and prevent consumer confusion. And parodies can be confusing. Now as a practical matter, parodies won't confuse when differences in marks, markets, or message, typically ridicule, signal that the brand company didn't make the joke. But absent these features, pervasive copying and trading off a brand's goodwill tends to confuse. And survey results showing consumer confusion indicate that the parodist did too much copying and not enough distinguishing. As to dilution, the Ninth Circuit held that the exclusions for noncommercial use mean noncommercial speech. That holding renders neighboring exclusions superfluous, and it nullifies Congress's decision to limit the parody exclusion to uses other than as a designation of source. This Court should give noncommercial use its ordinary meaning, a use not involving the buying and selling of goods. I welcome your questions. Could a statement be, could fail Rogers and be misleading yet not be confusing under the Lanham Act? Well, the statutory test is likely to confuse as to sponsorship. Yeah, I understand that. But I'm just wondering if there are two ships passing in the night, that it could be misleading yet have nothing to do with confusing. Well, so if it's misleading as to the sky being blue, you're right. That has nothing to do with confusion. But if it's misleading as to the origin, sponsorship, or approval of the goods, then absolutely, or services. So it's not, you're right, misleading in the abstract is irrelevant under the Lanham Act. It's confusion as to origin, source, or sponsorship. So if you just have a, I mean, I can go on with examples, but there's lots of explicitly misleading speech that doesn't violate the Lanham Act. So would we have to dispose of or overrule Rogers in order to focus more clearly on likelihood of confusion under the Lanham Act, or can they coexist? No, obviously not, since every case recognizes that the test involves a non-application of the Lanham Act because the Second Circuit thought the Lanham Act struck the wrong balance. So there's no way to keep Rogers and for you to win this? No, we can win this case on a narrow ground. There's no way to keep Rogers and be faithful to the text. We can win this case by the court assuming there's an atextual exception, and this court can go on and invent an atextual break to that exception. It's unorthodox for this court to do it, but you can certainly do that, and we've offered a bunch of distinctions. The problem is the text doesn't make any of these, and it's particularly unorthodox for this court to create exceptions as to parity and fair use when Congress put in two fair use explicit exceptions in the Act for both infringement and dilution and didn't see fit to do so here. So what would you do with the argument that Respondent makes that, well, the Lanham Act presents difficulties for the not-so-well-healed defendant or accused infringer? Yeah, well, I mean, the consequence of having a property right is property owners are going to protect them, and the consequence of their position is they would say if you have an intentionally 100% confusing as to customers, but as long as there was no overt lie, that they should have to get out and avoid the Lanham Act. If you're concerned about the First Amendment, I don't see how it would be valid, but someone could bring an as-applied First Amendment challenge. It just would borderline frivolous because it's confusing speech, and it's a property right. I just don't think a property right by definition in the intellectual property area is one that restricts speech. It's part of the bundle of sticks that you have a limited monopoly on a right to use a name that's associated with your good or service. Ms. Flott, I'm just wondering why you are making such a broad argument when there are pretty obvious narrower arguments available to you. So, for example, one could say that whether the Rogers test should exist, whatever its scope should be, this is an ordinary commercial product using a mark as a source identifier. In that case, whatever we might think about the Rogers test, that's far from the heartland of the Rogers test. The Ninth Circuit just made a mistake as to this. The end. Why wouldn't that be sort of the obvious or appropriate way to resolve this case if we were coming out your way? It's a totally obvious and appropriate way, but as a lawyer, we have a quandary that you usually are up here saying, I need a legal principle, and I don't want you answering my hypotheticals of, well, that's not this case. I think that's a pretty good legal principle. It's like it's an ordinary commercial product using a mark as a source identifier. That doesn't get any special protection. There is a legal principle for you. That legal principle looks a lot like the fair use exclusions that Congress didn't write in, but I'm fine with the commercial product. Here's the problem. Once you acknowledge or assume Rogers, you immediately get into the situation of your saying, I will allow a confusing short film, but not a confusing commercial. I'll allow a confusing painting, but I won't allow a confusing wallpaper. I'll allow a confusing video game, but I won't allow a confusing board game. I will allow a confusing tapestry, but not a confusing rug. As I said, this is not to suggest that there is a secure Rogers heartland. I'm just saying it's totally unnecessary in this case to think about that question or to get there. And I'll just add a little bit. The reason why every court of appeals that has thought about this question has adopted something like Rogers is because there are cases which look really different from this case. There are, you know, an art photographer does photographs using a Barbie doll, which is clearly meant to have some kind of expressive meaning and is not an ordinary commercial product like this one and doesn't use the Barbie doll as a source identifier. But the courts have been groping towards, maybe they've been right, maybe they've been wrong. All I'm saying is like, why should we decide that case when we decide this case? You don't have to, and the Barbie case is a classic case, that example of where there's an explicit fair use exception for dilution. We're fine with your dog toy case, but it's just so obvious that someone's going to ask about a dreidel or a Halloween costume or a coloring book or a tchotchke, ceramic pottery. There's just all kinds of goods out there that are ordinary commercial goods that you're sort of head scratching about, well, I don't know how that fit in. And I just think the video game versus a board game. A Scrabble comes in a board game and a video game. A 20-minute commercial looks a lot more expressive to me than a four-minute short film. So can I ask it this way? I guess I'm trying to understand why it's atextual, in your view, to focus on this idea of use of a mark as a source identifier. Because it seems to me that what you're describing as the problem is the court's grappling with the degree of expressiveness of various items in terms of determining whether or not this Art Rogers exception should apply. But I wonder whether the cleaner, more sort of consistent with the statute way of looking at it is to ask, is the artist using this mark as a source identifier, as the threshold? And if they aren't, then I guess the Lanham Act doesn't apply, because as you said, the Lanham Act worries about confusion that arises from use of a mark as a source identifier. So if they're not doing that, then there's no trademark problem. But if they are doing that, if it's being used as a source identifier, then I suppose we get into all of the questions under the Lanham Act test as to whether or not there's infringement. What's wrong with that? Well, unfortunately a lot, and with respect, that literally you're taking language in the text of parity and in the text of 1115b4, which you had a Supreme Court case on, KP permanent makeup, saying designation of a source are actually exceptions under two statutory provisions that don't appear in infringement. So I'm fine with you making up stuff. No, but I'm not making it up. I mean, you said here this morning, and I wrote it down, that the whole confusion issue, do you agree that confusion is the heart of the Lanham Act? Confusion has nothing to do with designation of source. So no, you're sorry, but in trademark law, you can have a very confusing use of a trademark. But I'm sorry, Ms. Blatt, you said a few minutes ago that it's misleading as to origin of source or sponsorship, that that's the confusion that we care about, that what the Lanham Act is trying to do is say, are consumers confused as to the origin, source, or sponsorship of this product? And I agree with you, but I'm wondering then why isn't that the threshold question? Yeah, just let me give you an example. The famous film pre-Rogers case, the Dallas Cowboy Cheerleaders, involving 12 minutes of graphic sex involving a trademark, was not a source identifier. It was just a very confusing use of a trademark. Let me just explain what a source identification means. It means a consistent and persistent origin of source, even if the source is unknown. So like iPhone, even though there's not a company called iPhone that makes the phone, it's Apple, iPhone is a trademark. But you can infringe iPhone's marks or any mark without indicating it's a source. You can put it on a T-shirt. You can put it in a movie. You can sell lots of products. It's just not being used as a trademark. And the statutory definition of infringement has nothing to do with use as a source. It's any use of a mark likely to cause confusion. And I know that I'm right about this, because designation of a source is an explicit carve-out under infringement. All right, likely to cause confusion in what way? So fine, you put the Apple mark not on something that looks like an iPhone so that people are confused about the source of that product. You put it on a T-shirt. So how is that a trademark infringement in the sense of origin of source? Sure, if you just put a T-shirt that says Apple sucks, that is a diluting – it's a use of the trademark. It doesn't indicate a source. It's just a statement. If you have your – put your favorite cartoon character in a movie. That's not a designation of source unless you – I'll put it this way. A title is not a designation of source. Gone with the Wind is not a designation of source. It has to be – Harry Potter might be. But just standard trademark law, and you can look at any case or any McCarthy, and it will tell you that you can violate the trademark law even though you're not engaged in trademark use. Ms. Potts, can I get you back to a question Justice Thomas asked, okay, and in court that Justice Kagan did. I have some hesitation doing away with the Rogers test because without knowing that the likelihood of confusion test is sufficiently flexible itself – by the way, you talk about making things up. The Polaroid test, the steel craft test, it's all traditionally crafted. These tests have to be because the statute talks about likelihood of confusion, and what judges have to do is figure out how do we get to that? How do we decide whether it's confused? So we've got to create some principles. I don't – I think you're right about it can't be just commercial products because then you get into can you use it in one setting but not another. It can't be just designation of origin because that doesn't have to do with improper use. I think it's contextual, and I think that all – you're shaking your head yes. Yes, absolutely. If you look at all of the factors, I call them the Polaroid factors because you know I'm from the Second Circuit, so I'm most intimately familiar with those. What they're trying to get at is whether the use of this trademark in this context can or is confusing. And so I see the Rogers test, perhaps not as articulated, but all of the circuits have some form of it, and it's all different, but I see them all doing something where they're saying there are certain contexts of use that are less likely or not likely to confuse. What the Second Circuit said with respect to titles is when you're talking about a title use, the context of a movie, you can't decide whether it's confusing until you look at the movie, and you decide whether or not the movie uses the title in an aesthetically pleasing way. I think they did add something to the likelihood of confusion standard that's not there because they said it has to have – I don't remember the words – but something greater than just the likelihood of confusion. Artistic relevance? Artistic relevance. That may have gone too far, okay? But my point simply is I would limit this to parity and not to anything else because parity as a context does ask not all of the Polaroid factors. It asks something very different, and that's what I would limit the likelihood of confusion test to. But I want you to answer these hypotheticals, all right? And I want you to answer them in view of what Justice Thomas said. Assume that I think that there are some uses that in context on their face should not require a litany of Polaroid factors with surveys and everything else for a court to be able to decide this on a motion to dismiss or summary judgment. An activist takes a political party's trademark, Adam Logan – I'm sorry, I missed the last part. Takes an animal Logan, a donkey or an elephant, okay? Oh, elephant. Yes, you know, whatever. I got it. One of the political party's animal Logans and makes a T-shirt where the animal looks drunk accompanied by a slogan, Time to Sober Up America. And they wear that proudly at a protest or hearing court. Do you want my answer? She sells these T-shirts on Amazon. Okay. The political party gets a consumer survey purportedly showing that 15%, 20%, 25%, 10%, whatever number we make up, okay, think the activist needs the party's permission to copy the logo. So I'm a judge. I know what I would do. But tell me what you would do. And do they have to go through a full trial under the Polaroid factors to decide this case? Okay. So, I mean, first of all, that's funny, your example. I'm going to give you that. Second of all, if I could go back to the point about Polaroid, the fact that a product, including your T-shirt example, is funny or it has a parody is not relevant. What is extremely relevant is whether the person viewing it would get the joke. So isn't that the issue that we're dealing with in confusion? Well, I'd like to get this answer out. It's not whether you get the joke. You get that somebody other than the brand wasn't making the joke because that's all that matters. Ha, ha, ha is not a standard under the Lanham Act. It's whether it's confusing as to source. Now, in your Republican, I'm sorry, elephant example. Well, that's going back to Justice Jackson's point, and you said it's not only about source. So what else is it about? Right. Okay. On your elephant example, in terms of if there's a mistaken idea that, oh, well, you had to copy. Okay. First of all, on consumer surveys, they're capturing, for whatever reason, because consumers are dumb or they're confused about the law or just the way they make marketing decisions, when surveys are picking up the real-world marketplace that a judge who has hindsight bias and is highly analytical is not going to represent the purchasing public. The reason we have surveys in the first place is pretty amazing. In 1948, Jerome Frank on the Second Circuit had a case involving teenage girls' underwear, and he said, you've got to be kidding me. I'm a man. Everyone on this court is a man. How am I supposed to know this? Couldn't somebody do a survey? And surveys were born, and that was in 1948. So it's just a little bit rich to trash surveys when the whole point that they came out was to help consumers. Now, on that bit about there's a mistaken perception, it's not a mistaken perception. You do have to get permission if it's confusing. Now, your example on the T-shirts, if there's a survey on 15% and I also heard in there some sort of implicit thing that 15% was too low, if this court had a rule saying, advocates, please do not have briefs that are likely misleading, and if you want us to say, advocates, that can go up to 50%, because it's okay if only 20% of judges found it deceptive, or even 40%. It has to be more than half. So I think what you're – No, no, no. That's the basic problem, which is the percentage. At some point, it's a political statement. It has First Amendment rights. And even if 20%, maybe even if 75%, it's very clear that at a certain point, those people may be wrong on the law. They don't need permission to make a political joke. They don't need permission to make a parody. Well, you need to get permission if it's a confusing parody. Now, in terms of your – I do want to get this point out. There are three very important sleek craft factors that bear on the specifics of parody. And the other dog toy case involving Chewy Baton, it was a play on Louis Vuitton and Chewy Vuitton. The contrast with that case and this case, I think, tells you everything you need to know about likelihood of confusion. In the Chewy Baton case, it was on substantial similarity in marks, the uses in the mark, and is there some sort of dispelling characteristics that says, you know, the definition of a parody is that you have to conjure up enough similarity, but then you immediately simultaneously distinguish and say, but this is not – someone else is telling the joke. And in the Chewy Baton case, the court said, I'm immediately struck by how different. Our court said, I'm immediately struck by how similar. There were nine virtually identical things that were unchanged. In the Chewy Baton case, he said almost all the designs were different. In the uses of the markets, in the Louis Vuitton case, Louis Vuitton makes dog products, but they're $1,200. They're complete luxury products. They only sell in boutique stores or in boutiques and department stores. In the Jack Daniels case, Jack Daniels makes dog products and sells licensed merchandise like hats and bar stools and what have you in the same markets that Bad Spaniels was selling. It's dog toys. And when you have a consumer survey that tells you the consumers didn't get the joke, they could have thought it was funny. And, by the way, only seven people said they thought there was a confusion as to who owned it, I mean, who needed permission, and that still left 25% confusion, which is still, you know, a massively high consumer survey. So it is not obviously – I don't know. Polaroid factors will be relevant. But the other thing I want to say before the government gets up here, for 30 years what I've been saying is what the PTO has been doing. They've been finding parody after parody, either confusing or not confusing, based on the same thing that this trial court did. It looked at how similar and famous the market is, and is there something that kind of says, whoa, it's so obvious. I think when the Republicans go around drunk and need to sober up, your average consumer is going to think the RNC didn't do that. But I could go on and on and on. The other thing I just wanted to say about your aesthetically pleasing, the movie Debbie Does Dallas was not aesthetically pleasing. It infringed a trademark. It infringed someone's property rights, and it was deluding. So the other side wants to talk about the uses they like. They don't want to talk about the pornographic and poisonous things that can be done when you infringe someone's trademark. Thank you, counsel. Justice Thomas, anything further? Justice Alito? I take it you're short answer to Justice Sotomayor is hypothetical, where let's say the survey shows 25%. Let's say it shows 30%. Your answer is that has to go to a jury. Well, we cited the Dark Knight case, the Fortas case that was resolved on 20. Would it go to the jury or not? Can you give me an answer? I think it would probably. I mean, it just depends if there was something wrong about the survey. But I don't know if it would. No, it would not go to a jury. It would be resolved on summary judgment. It would go on summary judgment in favor of the Republican Party or the Democratic Party. Well, it depends. Unless it meets 12B6, it survives a motion to dismiss. Let me give you some other examples that are in the briefs. I'm sure you're familiar with it. So this is from the Electronic Frontier Foundation's brief. So here's a poster. Let's say this is on a T-shirt. It says diamonds. It's got a picture of two hands. One has a diamond ring on it. And at the bottom it says, your purchase of diamonds will enable us to donate a prosthetic to an African who lost his hands in diamond conflicts. And at the bottom it says De Beers, from her fingers to his. Let's say that's on a T-shirt. What about that? Well, I don't think that's going to be likely confusing. If it's diluting, it will have an exception for fair use, unless that does not look like a trademark use. But if that becomes a line of books, movies, TV shows, and you're selling all kinds of mugs and coffees, then you would not have the fair use exclusion. But yeah, so you've got... The more it says something ridiculous or condescending about the brand, it's so likely to not be confusing. You always run a chance that you might have a dilution claim. But there's a fair use exception and a non-commercial use exception that are pretty robust. Could any reasonable person think that Jack Daniels had approved this use of the mark? Absolutely. That's why we won below. Really? Yes. Let me envision this scene. Somebody in Jack Daniels comes to the CEO and says, I have a great idea for a product that we're going to produce. It's going to be a dog toy. And it's going to have a label that looks a lot like our label. And it's going to have a name that looks a lot like our name, Bad Spaniels. And what's going to be in, supportedly, in this dog toy is dog urine. You think the CEO is going to say, that's a great idea. We're going to produce that thing. No, but Nationwide ran a Super Bowl commercial with a dead child in it. And they had to pull it because it was such a bad idea. I don't know who approved that one. It was really embarrassing for them. A reasonable person would not think that Jack Daniels had approved this. I think if you're selling urine, you're probably going to win on a 12B6. But you're probably also violating some state law. No, no, you're not selling urine. It's exactly this toy. No, it's exactly this toy, which purportedly contains some sort of dog excrement or urine. Okay, my bad. The CEO is going to say, this is a great idea. Well, just showing how confused I was suggests that I would be your perfect consumer. Justice Alito, I don't know how old you are, but you went to law school. You're very smart. You're analytical. You have hindsight bias. Well, I went to a law school where I didn't learn any law. Okay, that's just a little rich for people who are at your level to say that you know what the average purchasing public thinks about all kinds of female products that you don't know anything about or dog toys that you might not know anything about. I don't know. I had a dog. I know something about dogs. The question is not what the average person would think. It's whether this should be a reasonable person standard to simplify this whole thing. So since 1976, you've had this appreciable or substantial number of confusion. And, again, I think the best example is just you can enact a rule that says likelihood of confusion by judges or likelihood of deception. And if you think that's the average reasonable judge, okay. But I don't know how you would do a survey on that. And if you think there's something wrong with the survey, you can dismiss it. The court in booking said surveys have to be done with careful design and careful reading. And the court can reject the survey. Well, I'm concerned about the First Amendment implications of your position. And you began by stressing that Rogers is atextual. It was made up. You know, there is a text that says that Congress shall make no law infringing the freedom of speech. That's a text that takes precedence over the Lanham Act. And you said there are no constitutional issues. But your answer to Justice Sotomayor's hypothetical tells me there are important constitutional issues. Well, allow me to push back with the founding. Trademarks have been around since the 1500s. They predated the First Amendment. Same way with copyrights. And this court has had four cases, the San Francisco case, the Zabini or Zucchini, and then your Eldred and Harper and Rowe. And you've said on all four of those cases, even if it didn't involve confusing speech, it didn't involve any kind of intent, it didn't involve any kind of, I mean, those were all harder cases. And so it's a property right. I agree when you don't have property rights. But the definition of a property is it's going to infringe someone's speech. It is a limited monopoly as long as alternative. Well, is it your argument that anything that is, that so long as something is protected by the Lanham Act, there is no First Amendment issue? Well, when you say, yeah, I think that unless you're going to bring it as applied, you have to, yeah. I mean, it's confusing speech and it goes to the dilution. But, yes, I think the Lanham Act is clearly constitutional. You've all but held that in the San Francisco case. The question isn't whether it's constitutional. The question is whether it should be interpreted, and this is where Rogers may come from, in a way that does not bring it into conflict with the First Amendment. Well, then you should strike the statute as either facially invalid or as applied to a dog toy. It just seems that you're overturning centuries and billions of dollars of brand investment as to confusing. What I hear you saying is that you're worried about you think are non-confusing uses, but courts have been, I think we cited it on page 25, case after case that rejected parodies. Notably, none of those had survey cases. There are lots of famous cases where the court rejected likelihood of confusion. And as to dilution, again, I mean, there is a Supreme Court case on point, the San Francisco Athletic Association case. Thank you. Thank you. Any further Justice Sotomayor? Justice Kagan? Justice Gorsuch? I just want to make sure I understand your position with respect to the First Amendment. As I understand it, your primary position is that the trademark is consistent with the First Amendment. It predated it and was thought to be consistent by the founders at the time. Well, and it doesn't protect confusing speech. Fine. You're not, though, opposed to the possibility that there may be as-applied cases in which trademark law does butt up against the First Amendment. And that's the appropriate place to, yes, to say as-applied, it's unconstitutional. Yeah. And that could happen, and that could have happened here. Yeah, and that's the end of that. Yeah. One further question. Your friend, or your amicus, I should say, the federal government's about to get up, but I'm not sure how much of a friend they really are to you. I agree. And their argument is that the district court here failed to, even under the appropriate test that you are arguing for, consider parity and confusion in this case. And we should remand for reconsideration of that issue. Under existing standards, forget about the Rogers gloss. And I just wanted to give you a chance, briefly, to talk about that. Yeah, so, Justice Gorsuch, we agree you remand, and VIP has lots of arguments that we didn't meet the likelihood of confusion test. So that will be on remand. We'd have to win that. But as to the government's argument, which is that there was a weighing of the capitalizing on the goodwill and not enough weighing as to the need to copy, we are relying on 30 years of PTO case law that said, has never mentioned, they mentioned trading off a goodwill as a factor for confusing because it tends to confusion, and not once in 30 years has a PTO case rejecting registration based on parity as it said, well, we're going to discount the similarity. They're just looking at likelihood of confusion. You agree, though, that we would vacate and remand, and the Ninth Circuit will do what it will do. Yes, and they did brief. All those issues are fully preserved, the other side. So they have all those arguments on remand. Thank you. Justice Kavanaugh? Justice Barrett? Justice Jackson? So going back to Justice Gorsuch's point, isn't trademark consistent with the First Amendment because of trademark infringement's limited scope? And by that I mean, isn't the point of having a trademark to identify the mark owner's own goods or services and to prevent others from passing off their goods and services as the mark owner? So the confusion that we care about is that people in the marketplace are going to be looking at these items and think they're the mark owners because of the way they're labeled, rather than the person who actually created them. If I'm right about that, then I guess I'm trying to understand why shouldn't the defendant have to be using the mark in a way that identifies who is responsible for it in order for trademark infringement to even apply? So passing off was in the 1920 Act. It started getting extended past that in the 1946 and then in 1988, so it's just always been extended past passing off. And it's never been limited to designation of a source since the first Trademark Act of 1881. So you've had trademark law since the late 1800s. You struck the first one for being unconstitutional. All right, so if it's broader than that, then don't we start really worrying about what Justice Alito and others have brought up? If it's broader than that, then I think we start being concerned about impairing artists who are referencing the mark from doing that in their work. And I guess my thought was, all right, we have these artists with First Amendment rights or parodists or whoever. And the way we prevent infringing their rights is by making sure that trademark holders are only able to come in and accuse them of problems if they, the artists, are trying to designate the source of their products by using the mark. I think that's a reasonable policy proposal, but here would be my response to Congress, is that when you... Do you know what the statute was trying to do? That's the point of confusion. That's the area of confusion that you keep saying is what the statute is all about. So Rogers was not even applied past titles until 2003 and not to the substance of movies until 2008. We've had a very vibrant film and artistic community since, I don't know since when. So the arts have flourished. All right, one last question. I'm sorry. All right. Let's say that's my view, okay? If I think that the Lanham Act only kicks in if we have an item that is being passed off, as you say, or an item that is creating confusion as to the source or origin or sponsorship, all right, do you have an argument in this case with respect to this item that it's confusing in that way? As to origin or sponsorship or source. Yeah, that was the... I mean, that's on page five, but that was the survey. That was the finding, and on page five of our reply brief, we have six ways to Sunday on why this was a designation of source, including the admission in their complaint. All right, great. Thank you. Thank you, Counsel. Mr. Garnieri? Mr. Chief Justice, and may it please the Court. I'd like to begin by just addressing some of the questions that have already been propounded this morning, and particularly the hypothetical about the T-shirt depicting an elephant and the De Beers example drawn from the... That's either political party. Let's be clear. Unspecified political party parody on the T-shirt. You know, I think a lot of the intuition driving some of those difficult questions is that reasonable people are not likely to be confused about the source of those products or whether the target of the parody sponsored or approved the product, and I think that intuition is fully captured by the likelihood of confusion test, and that's the statutory standard that we think should be applied in all of those cases. Rogers and the position that Respondent is defending in this case is very different. That view says that you should be allowed for various vague First Amendment policy concerns. You should be allowed to engage in this behavior, even if it is likely to confuse consumers about the source of your goods or about the senior markholder's sponsorship or approval, and I think that view just can't be squared with the Lamb Act itself and is not compelled by the First Amendment. I welcome the Court's questions. So what exactly would you do with Rogers? Well, we think that Rogers was incorrectly decided and Rogers. The Rogers standard is inconsistent with the text of the Lamb Act, and I think you can see that for at least three reasons. First, as applied by the Ninth Circuit, Rogers is an antecedent test that the infringement plaintiff has to satisfy in order to even invoke the Lamb Act. The court reiterated that it put no two of its opinion on page 33 of the petition appendix. You have to get over Rogers and then also show likelihood of confusion, and that's just plainly inconsistent with the way the statute was designed to operate. The second point is that Rogers is substantively inconsistent with the Lamb Act. Rogers requires a showing either of a complete lack of artistic relevance or that the use of the trademark is explicitly misleading. But, of course, as Ms. Blatt explained, you can have confusing uses of marks that are implicitly misleading. So, you know, Rogers currently is operating to protect a lot of behavior that could cause, is actually likely to cause confusion to consumers, and the Lamb Act makes that kind of trademark use actionable as infringement. And then the third point is that Rogers was not conceived of as an application or an interpretation of the text of the Lamb Act, and indeed the case was decided under a predecessor version of the Lamb Act that didn't even explicitly contain the likelihood of confusion standard that should govern in this case. I always have hesitation in doing away with something that circuits have been relying on, virtually all of them, but applying it in different contexts. And we have amicus brief from different stakeholders, some saying it may not apply in parody, but it could apply in movie titles, it might apply in something else and not this, in novels, etc. Why should we rule broadly? And if we rule narrowly, on what basis? You've heard earlier at least three alliterations, one Justice Kagan's, one Justice Jackson, one me, limit this just to parodies, because parodies really do rely on, is this a joke that people are going to get? Sure. Justice Sotomayor, let me make a couple of points in response to those concerns. First, just to address the status quo, it's not the case that all circuits have applied the Rogers test. There are many circuits that have never adopted Rogers. There are many circuits, including the Fourth, Fifth, and Seventh Circuits, that I think address parodies the correct way, the way that we advocate, which is you can take the parodic nature of the use into account under the existing likelihood of confusion standard, which is actually the statutory standard. The second point is, I mean, I would grant you that there are a number of courts of appeals that have followed Rogers, but many of those cases involve titles, as Rogers involved in title. The Ninth Circuit has really dramatically expanded the scope of Rogers to include... Well, that begs my question. Sure. Why don't we just decide on parody rather than everything else? Well, I think Rogers, at least as conceived by the Ninth Circuit, is not limited to parody, so I think the court would, if you're saying that Rogers is inapplicable to the circumstances of this case, I think you would probably logically be saying it shouldn't be applied not just in cases involving parody, but in other... I don't know why that's logical, because we're not dealing with titles, movies or anything else, fiction. I'm sorry. Go ahead. Well, I mean, I think our principal response is that if the rationale for the decision that the court adopts is that Rogers can't be squared with the Lanham Act, it's hard to understand how that would be limited to parodies. It wouldn't apply equally to other supposedly expressive uses of marks that are currently covered by the Rogers test in the Ninth Circuit. Counsel, is the government's position that in the case of likelihood of confusion, the Rogers test is out of the picture, or that the First Amendment across the board is out of the picture? I think it's just the former. We just think the Rogers test is the wrong way to approach these cases. It dies in a sound basis in trademark law or, indeed, in the First Amendment. But, you know, as Justice Gorsuch's questions to Ms. Blatt illustrated earlier, I think you could still have an as-applied challenge. I think if the court gets rid of Rogers and tells the lower courts that Rogers is not the correct way to do this, the correct way is to apply the likelihood of confusion standard, that doesn't foreclose an as-applied First Amendment challenge in an appropriate case. But Rogers is not itself an application of any established First Amendment principles. I cannot think of any area of this court's First Amendment jurisprudence which requires courts to make judgments of artistic relevance or in which the government's authority to regulate turns on judgments of artistic relevance. The explicitly misleading prong of Rogers also has no sound basis in this court's First Amendment precedent. There are areas of false and misleading speech in which the government can regulate, but those, you know, including fraud, defamation, perjury, in those areas of unprotected speech, it has never mattered whether the deceit is explicit or merely implicit. I mean, that's just a distinction that was made up by the Second Circuit in Rogers, and I think it's time to put an end to it. And, Counsel, I'd like to understand what you would have us do with respect to the remand, because you do argue that even under the Lanham Act's text, always a place to start, likelihood of confusion that the district court erred, and it didn't fully account for the parity nature of this product. So exactly what instructions and how would you articulate that? Sure. Well, in our view, the district court committed legal error in failing to take account of the parodic nature of respondent's use when applying the likelihood of confusion factors that are applied in the Ninth Circuit. I think that is primarily apparent in the district court's consideration of the similarity of the Marx factor, which is a factor that all the courts of appeals consider relevant to evaluating the likelihood of confusion. The district court, in our view, the way that parity enters into the picture in most of these cases, that ordinarily you would think that the more similar two Marx are, the more likely consumers are to be confused. And a fact finder could conclude that that's not the case in a parity case, because the parity by its nature is going to be drawing some humorous contrast with the original, and that contrast will itself serve to distinguish the two in the minds of consumers. And I think the court could make that clear in its opinion. And a petitioner and the government have a disagreement about how best to read the district court's opinion, whether the district court actually made the legal error that we think the court made. That's really a question for the Ninth Circuit to resolve. Let me see if I have it. Okay. And I may not. But the similarity of the Marx was a great emphasis in the district court's opinion, and perhaps too much to the point where there are some parities in which the Marx are going to be very similar, but everybody, or most everybody, or a reasonable person, and I guess the question is which of those, would understand that the whole point of the joke is that it isn't the trademark holder's product. It's somebody else's. Yes, Justice Gorsuch. I think that's exactly right. Mr. Guarnieri. Which of those is it, some percentage or a reasonable person? It's an appreciable number of ordinary consumers exercising ordinary care. That's a long-standing standard. It's derived from this Court's cases that predated the Lanham Act. And what about the fact that a lot of people surveyed may think that, as a matter of law, it was necessary to get the approval of the Marx holder? That's a hard case. That's a hard question. There are certainly some amici supporting respondent who say that that's a kind of legal mistake that should just be dismissed in the likelihood of confusion analysis. I think that's hard to say because the Lanham Act itself, one theory of trademark infringement is that consumers are confused about whether the Marx holder has granted its permission to use its marks. That is, whether it has granted legal permission to the allegedly infringing junior Marx. If the surveyed consumers think, yeah, you couldn't do this without getting Jack Daniels' permission, I think that's evidence of likelihood of confusion. Now, I will say, just to step back a second, surveys are just, I mean, it's one piece of the puzzle here, but it's not the whole thing. They are meant to be an approximation of consumer perceptions in the marketplace. The point is that these surveys are expensive and they're in a test that is a multifactor test, which is confusing, which doesn't provide a lot of guidance in particular situations. It's an extremely kind of expensive litigation to go through. So when you look at these hypotheticals that were given to you, whether they're political or whether they're artistic speech, and your first line defense of this, and as I can see that your second and third line defense too, is don't worry, you'll win on likelihood of confusion. I think that what this Rogers test is all about is to say that there are some things, the political hypotheticals, the artistic speech hypotheticals, that shouldn't have to go through this whole analysis. And that we can get rid of in the first instance on a motion to dismiss without surveys, without a lot of fuss and bother. Well, Justice Kagan, you can adjudicate a trademark infringement suit on a motion to dismiss at the 12B6 stage if the allegations in the complaint do not plausibly allege infringement, if they do not plausibly allege a likelihood of consumer confusion. That's the ordinary standard that applies in every other context in federal litigation. Well, every other context in federal litigation doesn't involve the kinds of clearly First Amendment protected speech that these hypotheticals are about. So the point of these hypotheticals is to say that every other context in litigation really doesn't cut it when you're talking about protected political and artistic speech. Well, in any other context, if you were the defendant in one of these cases, in a non-trademark case, and you were the subject of a statutory claim and you wanted to raise as a defense that the First Amendment protected your conduct, you would have to litigate that defense. You don't get a special off-ramp at the beginning of litigation just because it might be expensive to litigate the defense that you like to raise. And I think in general, the costs of litigating a trademark infringement suit are not a compelling reason to displace the statutory standard with this broader standard that is not itself based in trademark law or, indeed, based in established First Amendment principles. The other thing I would point out, I mean, I take the point in some of the briefing on the other side that there is a possibility or a threat of abusive litigation tactics that could chill legitimate, non-confusing uses of marks, and I think that Congress already addressed that concern to some extent by providing for fee shifting in the line of match, which is itself an unusual feature in federal law in an appropriate case, a district court that found that a case was brought in bad faith to chill speech that is not confusing, you could award attorney's fees, and that serves as a deterrent to some extent. Some of the hypotheticals and actual cases that are highlighted in the briefing in this case do seem to me to present serious First Amendment issues, and you seem not to be very concerned about the free speech implications of the position that you're taking. Here's another example. This is a real-life example in one of the briefs. There's a college. I won't say what it was. Let's say it's ABC College, and a professor, and there's a website called ABC, it has ABC in it, and it is dedicated to criticism of the college for corruption and mismanagement, and the college brings suit, claiming that that's an infringement of the mark. Look, it's very difficult to imagine in a case like that that an ordinary consumer exercising ordinary weak care would be confused about whether this website that is highly critical of the college, whether the college was the source of that website or otherwise sponsored or approved it. So I think the likelihood could be dismissed under 12b-6, if they plead that there was a likelihood of confusion. You'd have to know more about the complaint, and the fact finder would have to be making a judgment about whether the allegations of confusion are plausible. I think that you do have some cases that are dismissed at the 12b-6 stage in this area, so it's not impossible. But, again, I think the likelihood of confusion standard can capture that case. And, indeed, I don't take a lot of the amici who favor Rogers to be saying that the cases would really come out differently. The claim is just that they don't want to have to go through the process of demonstrating that consumer confusion is not likely, and I don't think that itself is a sufficient basis for maintaining Rogers. Thank you, Counsel. Justice Thomas? Justice Kavanaugh? And Justice Barrett? I'm sorry. Justice Jackson? Mr. Cooper? Mr. Chief Justice, and may it please the Court, in our popular culture, iconic brands are another kind of celebrity. People are constitutionally entitled to talk about celebrities and, yes, even make fun of them. Jack Daniels advertised in a self-serious way that Jack is everyone's friend, and Bad Spaniels is a parody playfully comparing Jack to man's other best friend. It's clear in this case that what Jack Daniels is complaining about is not Bad Spaniels as a designation of sorts. They're complaining about the speech, the parody, the comparison to dog poop, and a Bad Spaniels, not the mark. Parodies on noncompetitive goods like Bad Spaniels aren't likely to cause confusion as to sorts or approval. As this Court recognized quite properly in Campbell, companies simply do not license lampoons of their own products. The circuits developed the Rogers test to protect expressive works generally, and it keeps the threat of extended litigation from silence and speech. That's particularly true when well-heeled celebrities go after parodies. The Solicitor General agrees that the general multi-factor test is usually applied, does not work for parodies, and that the District Court misapplied the factors here. More broadly, a test that convicts pure parodic speech, like Mutant of Omaha, Nuclear Holocaust Insurance, or Michelob, Oily, and Humor Magazine is broken. A test that requires significant resources to vindicate obvious parodies, like Wal-Kaida, or Holocaust, or Chuy Vitan, is simply the wrong tool for the job. If the Court is inclined toward the Solicitor General's position, the Court should provide more guidance to lower courts than simply, hey, keep that parody in mind, because the burden of litigating the irrelevant or inverted factors itself chills speech. Stripping out those factors, a more focused version of the general test would ask three questions. One, can the Court reasonably perceive the product's parodic character? That's taken from Campbell. Two, what is the proximity and competitiveness of the party's goods? That's taken from the standard test. And third, does the parody otherwise fail to differentiate itself from the parodied mark? This test protects speech while denying a free pass to knockoffs and counterfeits. But fundamentally, the First Amendment is not a game show, where the result is, survey says, I'm confused, stop talking. I welcome your questions. So is your concern, are you as much concerned about the test itself or the location of the test? So what if your test and the factors that are concerning you are rolled into the multi-factor test? Your Honor, I think the Rogers test, if I understand your question, The Rogers test is a simpler way of addressing it. Well, I understand that, but what I'm trying to get, I'm trying to understand is whether or not you are more concerned about the fact that Rogers preempts the Lanham Act multi-factor approach up front as opposed to you're having the exact same test, but at the multi-factor stage. Your Honor, we think that the Rogers test functions best as a screen that takes out all the expressive works at the beginning, so you never have to get to it. In other words, you prefer the Rogers test because it precludes the application of the full Lanham test. Well, at least the multi-factor test, as that's conceived of as an application. Yes, because the multi-factor test, as this Court recognized in Wisconsin right to life, that kind of rough and tumble open-ended inquiry itself chills speech. So now, with that, what is your best textual hook for Rogers and for the off-ramp that you're proposing, and that the Ninth Circuit apply? We think that the broad standard of likely, confused, and perceived is fine. There is an entire edifice built under the Lanham Act to try to reconcile that with First Amendment text, whether it's fair use doctrines, which are non-statutory, whether it's nominative fair use, whether it's the Rogers test. There are ways of meshing that and understanding that this text does not provide a standard for the quantum or the mechanism or the means of causing confusion or identify what kind of confusion. Well, but the Rogers test doesn't seem to have its roots in First Amendment jurisprudence, though. Well, I think one has to differentiate. The Rogers test, as it was originally formulated, and I agree that it's not the most well-phrased test in terms of artistic relevance. I think the intellectual law professor's brief in support of neither kind of approaches the more accurate test to say, not is it artistically relevant, but is it a gratuitous use for the message? So as long as there's a connection, it's not just throwing on a funny trademark that has nothing to do with the rest of the good, then that has a significant relevance. And I think as applied in the parity case, parity is an easy case because of the nature of parities and both saying, I'm the original, but I'm also not the original. Can I ask you, you said that Rogers screens out expressive works. And I think part of the problem that I'm struggling with is all of the uncertainty we have as to whether or not something is sufficiently expressive. And that seems to be where there's a lot of problems in the administrability of the Rogers test. So let me ask you one question, which is, is it your view that expressive works can never confuse as to source or origin? Because if an expressive work can, I don't understand why it would be entitled to be screened out. I think it's highly unlikely that, and in fact I haven't seen an example where you could have an expressive work that was likely to confuse if it was not otherwise explicitly misleading. What about the hypothetical of this very scenario? So let's say VIP made a dog toy that was the exact size, shape, and color of a Jack Daniels bottle. They called it Bad Spaniels, but the label is identical and everything is the same. And there we have it. Are you saying that that scenario is one in which you would still claim entitlement to expressive screening out? In other words, if we know that these things are basically identical except one says Jack Daniels and the other says, or let's do it this way. What if it says Jack Daniels? That's an easier hypothetical. The chewy dog toy says Jack Daniels and it's the same color, size, shape, and everything. It is easy because we would consider that to be explicitly misleading. The parody here though is not putting Jack Daniels on a dog toy. There is far more to it. What is there to it? What is the parody here? The parody? Maybe I just have no sense of humor, but what's the parody? The parody is multifold. The testimony indicates, and it's not been disputed, that the parody is to make fun of marks that take themselves seriously. You say that, but you make fun of a lot of marks. Doggy Walker, Dos Peros, Smell-O-Arpa, Canine Cola, Mountain Drool. Are all of these companies taking themselves too seriously? Yes, in fact. I mean, it's just like soft drinks and liquor companies take themselves too seriously as a clash. I think there are a lot of products that take them too seriously, and merchandise. You don't see, for example, something near and dear to my heart, a parody of Woodford Reserve bourbon, because you don't get that building up of an edifice of making them into an iconic, a cultural icon and reference point. When you advertise on TV incessantly, and you create this image of yourself as something that's so important. So you're just saying any time you go out after, or you use the mark of a large company, it's a parody, just by definition. Because they must take themselves too seriously, because they're a big company. I think, as applied here, there's no doubt that Jack Daniels takes himself very seriously. No, I don't know. I don't think Stella Artois takes itself very seriously. They have very funny commercials. And I've seen their historical commercials, and they would honor a parody too. But Jack Daniels is at the head of the line. I mean, this is a... Okay, I've made my point. No, and I think... Counsel, I think the point has been made. I just have a slightly different question. With respect to Rogers itself, you've said the artistic expressiveness isn't quite right. And you'd agree that judges would make for pretty lousy art critics, I assume. That's correct. Okay. So do lawyers of all kinds. Thank you. I appreciate that. The other part is this explicitly misleading prong. And our First Amendment doesn't protect speech that is misleading often. It doesn't give it the same protection always. And I'm not sure where explicitly comes from as opposed to implicitly misleading. That would also seem to have different First Amendment implications. So where does that come from? The problem of artistic use, Your Honor, or any kind of expressive use. Well, we've already put that aside. So the explicitly misleading portion. Right. Well, here's the problem. First of all, explicitly misleading is a way of identifying a mechanism of confusion. So it's consistent with statute. Oh, so it's confusion then. It's confusion caused by an explicitly misleading form. But confusion's the right standard. Well, it factors into the Rogers test. The statutory standard factors into the Rogers test through the explicitly misleading portion. As we've argued in a brief, it brings the confusion standard in. I think I understand. You had a three-part test that you started with at the beginning that's different from the Rogers test. Yes, it is. It's an alternative based on, that's derived more from the multi-factor test, if you strip out the inverted or irrelevant factors in the case of parity. Right. Okay. And those are things that are grounded in the statute and its traditional interpretation.  The reality of parity is that people don't license lampoons as their own product. Would you be okay with that? You argued for it in your opening, so I assume the answer is yes. I think for parities, it approaches the Rogers test as a means to protect speech while not denying a free pass to knockoffs and counterfeits. Thank you. I've been confused by your allegation in your complaint that bad spaniels trademark and trade that you're the owner of it. Can I stop? The only trademark I see on your product is on the silly squeakers. That's the source, silly squeakers, correct? Yes. That's the trademark. That is the actual trademark. And that's the only thing that has an R on it. Right, RRTM. Okay. I'm not sure how you're calling bad spaniels a trademark or why you're calling the bottle, which you admit is the Jack Daniels trade dress because it's a unique square bottle, how you could claim it as your own. We're not, Your Honor. But Jack Daniels is claiming that we are using that as a trademark. So why did your complaint say that you are the owner of all rights in bad spaniels trademark and trade dress? Your Honor, it's a form allegation of legal ownership, which is a conclusion. It's not under Ninth Circuit precedent any kind of judicial admission. What we were just saying in the kind of rote way you do in complaints that we own, we're bad spaniels. You're not bad spaniels. You're silly squeakers. We're silly as a designation of source on the product. I mean, every designer of products that puts their trade name on it, name any famous designer, they have a logo that symbolizes them. They give each design a different name. That's what you do. Bad spaniels is one among many other names, Justice Kagan. That's right. We have argued throughout the case in the district court and in the court of appeals that neither bad spaniels nor the label and the appearance on the toy are designations of source or function as a trademark. But some of your other toys are registered trademarks. Aren't they? Doggy Walker is registered. Dos Perros is registered. Only the standard character mark, what used to be called the type mark, only that name, not the parodic image. And Jack Danvers has made clear in this case that they don't consider bad spaniels to be infringing. It's the totality of the whole look. In fact, in their confusion survey, they used bad spaniels and the dog head, as it appears on the hag tag, the product, as their control sample. Did you agree with the suggestion that the First Amendment does not protect speech that is misleading? You wouldn't have very much speech in this country if that were the case. I think that's an overbroad statement. The court held that it protects speech that is demonstrably false and alvarized, didn't it? Well, in fact, because people were not relying or going to be misled, something approaching fraud. In this case, there's no evidence that anyone would buy the bad spaniels toy, without believing that it either came from Jack Daniels or Jack Daniels sponsored it in the way that, you know, McDonald's sponsors something that actually comes from its franchisees. So why isn't that the threshold test? Why don't we just ask that at the beginning of all of this, with respect to any argument about trademark in this way? Why don't we ask, would a customer, you know, mistakenly believe that this thing came from Jack Daniels, was sponsored by Jack Daniels? Why do we need a Rogers test that is importing, you know, these other kinds of criteria that don't seem to be grounded directly in the statute? Because the methods in which, in a commercial case, with parties that should be operating entirely at arm's length, we determine whether someone would reasonably believe that there was a claim of origin or a claim of sponsorship or representation. Exactly. I'm just saying, so why isn't that the question at the beginning? Because it's so difficult, it's so subject to misapplication in expressive works, including parodies, that the standard... You said parodies are clear. Parodies are the paradigmatic easy answer to that question. We agree, Your Honor. We agree that this should have been a case susceptible of resolution by a motion to dismiss or motions for summary judgment because no one looking at this toy could possibly believe. And it wasn't precisely because we have a Rogers test that I think is confusing people into doing other things. No, the district court threw away the Rogers test and applied the multi-factor test and got it wrong. Well, what if we did remand this case, as the Solicitor General suggests, and say, we're not sure where this Rogers thing comes from, but we do think that the district court may not have given adequate weight to the fact that this is a parody and the proximity and the differences in the label in its analysis. Would you have any objection to that? Yes, Your Honor, because the problem... Most lawyers don't stand at the lectern and oppose a win, but this will be interesting. I would prefer more of a landslide win than... Oh, well. And something also that... Fair enough. Who wouldn't? And something that also in future cases would provide a clearer guidance from saying, consider how parody plays into it. The problem is, and I say this, before I was an appellate lawyer, I was a trademark lawyer, when you have to litigate six, seven, eight, nine, ten factors... If we're going to talk about factors, you're asking us to put more factors into the equation, not fewer, and some that aren't in the statute. And it's an antecedent door that has to be opened before you can get to the statute. First of all, I think I've gotten it down to three factors here, and I think there are things... Those you say are in the statute. I'm talking about the Rogers factors, artistic relevance, where lousy are critics, and all that sort of thing has to be done before we even get to those. I think the word artistic could be stricken from the copy of Rogers. I think it's really a matter of relevance rather than artistic relevance. And I think in practice, it has not proven a test that is difficult to apply on a fair and reasonable basis. And courts have been able to distinguish, for example, in the Harley-Davidson case, someone just using a mark and claiming Rogers and saying, no, there's no message here, there's nothing here. You take as a second best the win. I would take it and say, well, we'd like a win under any circumstances, but I'll take it under the second best. I'm sorry, go ahead. No, what's critically important, Your Honors, is that whatever the test is, it's something that in this case or other cases can be applied simply and fairly and without spending people who are, as parodists, are punching up in every case. So for me, you still have to fight against a loss. Okay. So, I mean, whatever the... Whether the Rogers test gets the question exactly right, whether there should be a better test to think about First Amendment issues, you're sort of out of that. I think you're sort of leagues away from that. This is a standard commercial product. This is not a political T-shirt. It's not a film. It's not an artistic photograph. It's nothing of those things. It's a standard commercial product. I don't see the parody, but, you know, whatever. You're using this as your complaint says, as your registration on the other product say, as the placement of your hang tag says. You're using it as a source identifier. It seems like just not a First Amendment Rogers kind of case. And the First Amendment Rogers kind of case, I think what this argument suggests is, those are hard questions. Why don't you... I guess the question is, why aren't you leagues from Rogers? I will agree with Jack Daniels' counsel on one thing. The distinction between utilitarian goods and expressive works is a non-existent standard. Your Honor gave as an example a T-shirt. T-shirt, people buy them in order to not get caught up with public nudity. They are functional utilitarian goods, but they may also bear a message. Whether it's a hat, or a hat, we all know can become political symbols, or a T-shirt or a coffee mug. Okay, a dog toy, I'm just going to say, is a utilitarian good. There might be some hard cases. I actually don't think that the political T-shirt is a very hard case. It says something that's making a point. But dog toys are just utilitarian goods. And you're using somebody else's mark as a source identifier, and that's not a First Amendment problem. And if we, Your Honor, if we changed the hypothetical and we said, okay, put on the hand tag, not for use with real dogs, and it was sold purely as a collectible, because that's what the testimony was, they intended that this was in part be a collectible, from the graphic designer who worked it up. Then it would not be a utilitarian good, it would be soft sculpture in copyright terms. It would be an art piece. It doesn't matter whether you use it with your dog, or you put it on the shelf, as I plan to do, and laugh at it from time to time. It is still an expression. And what they don't, what Jack Daniels is upset about, is not the utilitarian good. They're upset about the speech that's born on it. But it does matter whether you put it on the shelf, because the Lanham Act doesn't care about that. If you put it on the shelf, right, then you're not using it in commerce. You're not shopping it around, and potentially confusing people into thinking that Jack Daniels is selling this. That's the whole heartland of the trademark. I'm sorry if I wasn't clear about my hypothetical. If VIP products sold that toy, not as a toy to be used with a dog, but as soft sculpture for people to buy and put on their shelf to get a good laugh at the joke, which at least some people get. In fact, that would take away its supposed utilitarian value, but it would keep its expressive value, because what people laugh at is not the fact that it's a dog toy, it's the speech on it. Would you object, if Jack Daniels was doing that, to a test that would say, when you were sued, I mean, if VIP was doing that, to a test that would say, is this item being used as a source identifier for this product in a way that would confuse people into thinking that Jack Daniels was actually sponsoring or it was made by Jack Daniels or whatever? Would you object to that being really the primary question that is being asked? Well, that inquiry, Your Honor, does not turn on whether it's being used as a utilitarian good or not. True. I'm asking something slightly different than that. The question is whether people perceive, whether a reasonable, objective, reasonable consumer would perceive that this came from Jack Daniels. Right. Rather than, does this have artistic value? Is it explicitly misleading? All of these other questions. Why isn't the question just whether people, in looking at this, a reasonable person, et cetera, the way the Lanham Act, I understood, directs courts to look at, are people confused into believing that Jack Daniels created this, sponsored this, or whatever? I think Your Honor could do that. The problem, I think, that Rogers recognized is, to paraphrase my opposing counsel, but we've got a survey. No. And the Rogers court said, and let me just say, it's a survey and also, I think, as the Cliff Notes court and other courts have noted, that when you're dealing with expressive work, you have to change, you have to accept a slightly higher degree of confusion. But it sounds like what you're doing is saying, when you're dealing with an expressive work, we get a pass under the Lanham Act. We get to, even though the standard, ordinarily, for trademark violations and what Congress cared about is people putting things into the marketplace that confuse consumers into believing that it's from the markholder or is sponsored by the markholder. If it's an expressive thing, then we don't really have to do that. We can put our thing out there. People can be totally confused, but we then just scream First Amendment and we get out of Lanham Act liability. And I don't see that in the statute, and that's what I'm worried about. And I don't see that in the First Amendment either. I don't think you have to go that far to accommodate the first free speech considerations in the Lanham Act test. And I think a lot of those cases where people say, oh, we're expressive and we're doing something, the Rogers test itself would address through the application of the prongs. Even the use is gratuitous just to test. You don't think that could be taken care of through the factors in the Lanham Act? It could be. Isn't that the government's position in this case? They say just do it under the Lanham Act and send it back and have parity taken into account. It could, but it won't be unless this court provides more guidance as to what that means. And that's why we gave that stripped-down version of the test. Justice Thomas? On a separate subject, could you just elaborate a bit on why a product that you can buy online or Petco is noncommercial? Absolutely, Your Honor. We live in an age where, and it's actually true in all past ages, everything is for sale. Whether something is sold or not does not make it noncommercial or commercial. In fact, under the Lanham Act's test, under Section 1127, which has definitions, if the test were whether you can buy or sell it, in fact, the noncommercial use exclusion would mean you'd have to have something which was not bought and sold in commerce, which is defined as the ordinary course of trade in the statute. So that's just an impossibility. And I think both the legislative history and the textual analysis of 1125 and 1127 point to the use as a referent of this court's commercial speech, noncommercial speech distinction. And that teaches that it's only commercial if it does no more than propose a transaction. And in this case, the parody is not proposing a transaction in anything because there is no product. There is no bottle of poo. It's simply making a joke, and the joke is noncommercial. But that's what the struggle was, I think, in the Ninth Circuit's MCA records case, looking back at the legislative history, and also the commentary we've submitted to the court of analyzing what this exclusion purposefully was supposed to serve and what the reference was and how it fits with not only this court's doctrine on noncommercial speech, but also how it fits with the other exclusions. I still don't know what that means, but give me an example of something that is commercial, then. A commercial would be an advertisement. No, no, no, something that is commercial, that fits, that is not noncommercial. I think an advertisement would be commercial speech, that it proposes a transaction. And so if we were to have something that advertised a product, let's say Bad Spaniel's Whiskey, and it was an ad for Bad Spaniel's Whiskey, that advertisement would be commercial speech. You're proposing a transaction. But that's not what we're doing here. We're not selling a bottle of diluted dog poo, which is the subject of the parody that they're complaining about. The Ninth Circuit and other, the government is proposing in Petitioner that noncommercial is anything you buy or sell, and you've answered that. But they also make the point that saying that noncommercial is anything that has speech in it is too broad, that that would do away with the exception for parody, and that itself would undermine the trademark dilution definition. You wouldn't even need noncommercial, because the definition says that it applies only to the goods that are in commerce. So why would you need the word noncommercial at all? Well, you could have a commercial use in commerce. But the real problem is unless you read those exclusions broadly, as we think is appropriate, you run into the plain fact that dilution by tarnishment is unconstitutional viewpoint discrimination. You're being joined if you tarnish, but not if you burnish. It's an end run around the definition. Well, but that might be true if we were talking about a Mattel-type case, but we're not. We're talking about a case with many exceptions, including a direct exception for parody. So I'm not sure how it runs into an unconstitutional First Amendment burden. But the Ninth Circuit and other circuits have relied on our commercial speech doctrine and analogized noncommercial to that doctrine. The Ninth Circuit did it before this case. Yes, MCA record. So why is that wrong? Why is that wrong? I'm sorry. Why is that wrong? It's not wrong. I mean, I think it's the appropriate interpretation to compare it to this. But this would not, under our commercial speech doctrine, this would still be commerce. It would not be a commercial use because the parody is doing more than proposing a transaction. It's not even proposing. It's doing both, Counselor. You want people to buy this product because of the parody. That's not the task force. I mean, I've seen, I'm exaggerating only slightly, I've seen thousands of dog toys in the market and you pick based on something uniquely funny about a particular toy. That's correct. But that's not the test. So that's proposing. You're proposing a transaction. Any product you sell proposes a transaction in the sense that it's an appealing product. But that's not what the test is. It's not. Thank you. Justice Alito, anything further? Justice Sotomayor? Yes. Justice Kagan? Yes, of course. Justice Jackson? Yes. Thank you, Counsel. Thank you. Ms. Blatt, rebuttal. Thank you, Mr. Chief Justice. Justice Alito, all trademarks are expressive. They have speech rights. And every time you infringe them, it's going to implicate speech by definition. And what the other side, and I don't hear you guys talking about, is the half of speech that no one likes, the pornography and the poison. And it is hard for me to see how you can say that the trademark owner doesn't have an interest in something that approaches compelled speech if their mark has been using in porn films and porn toys and sex toys and people are profiting off of that. In terms of where we're going with the message versus the product, the T-shirt example is a very entertaining case. The case is on page 25, All Are Rejecting Parity. And it involves the Miami Vice T-shirt that's turned into Miami Mice T-shirt. Very funny. No one would think it's confusing because they're cartoon mice. And so there are plenty of T-shirts that just don't meet that confusion. The First, Seventh, Tenth, and D.C. Circuit have not adopted Rogers. Twombly and Iqbal, there's a case we cited on page 11, our brief out of the Seventh Circuit, and it is a case saying it's completely implausible that the clean slate program of the Dark Knight movie could be confused with a clean slate software program, and the court dismissed that on Twombly, excuse me, 12b-6. As far as I know, Rogers doesn't even get dismissed on 12b-6. It goes to summary judgment, so I'm not sure how Rogers helps. In terms of, you know, the disconnect between Justice Jackson and Justice Sotomayor, Justice Jackson is talking about designation of source and Justice Sotomayor is talking about parody. But, of course, those two intersect. You could have a political message on a dog toy. You can put a parody on a T-shirt. You can put a political message on a calendar. One man's tchotchke is another man's paperweight. They are both decorative. And then any time you mention holidays, like Christmas lights, Christmas ornaments, Christmas trees, Halloween costumes, and I mentioned dreidels, menorahs, et cetera, I don't know what that is. It sounds too expressive to me, but they're all utilitarian. Finally, well, two more points. Justice Thomas, the examples of uses in commerce, which means trade or interstate commerce, sales over state lines, the examples that would not be commercial use are tweets, anything like a TikTok video, so that's social media, any televised campaign speech, campaign buttons, opinion articles, and pamphlets. So those are all goods that move in commerce, not commercial because they don't involve the buying and selling of goods. Finally, in terms of the remand, we, of course, want the court to remand, and we think the issues are preserved. But it is somewhat galling to have the SG's office come up time and again and don't even mention the PTO's position. They have 30 years of case law that doesn't mention anything they're talking about today, and the government doesn't even mention it in their brief. I think that's unacceptable for them to come up here and say the opposite. Thank you. Thank you, counsel. The case is submitted.